UNIBAND, INC., PETITIONER *v*. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 4718–06.　　　　　Filed May 22, 2013.

P is a Delaware corporation, wholly owned by T, an Indian
tribe. For the years at issue P attempted to file consolidated
returns with C, another corporation wholly owned by T. P con-
tends that T is the common parent corporation of P and C and
that together they constitute an affiliated group eligible to file
a consolidated return. On the returns filed, P did not claim
Indian employment credits under I.R.C. sec. 45A even though
P was entitled to them; instead P deducted the entirety of its
employee expenses. R determined that the consolidated
returns that P joined in filing were invalid and that P was
required to claim a credit under I.R.C. sec. 45A and reduce its
wage deduction by the entire credit amount (without regard
to credit limitations for particular tax years). P now contends
that it is not subject to corporate income tax because it is an
integral part of T, which because it is an Indian tribe is
exempt from income tax. *Held*: P, as a State-chartered cor-
poration, is a separate and distinct entity from T and is not
exempt from the corporate income tax. *Held*, *further*, the
consolidated returns filed for the years in issue were invalid
because T, as an Indian tribe, was not eligible to join in the

230

filing of a consolidated return, and P and C alone did not constitute an affiliated group. *Held*, *further*, the Indian employment credits under I.R.C. sec. 45A are not elective; and as a result, P's employee expense deductions for the years at issue must be reduced by the amount of the credit as determined under I.R.C. sec. 45A without regard to limitations on the allowable amount of the credit.

*Scott A. Taylor*, for petitioner.
*Jack Martin Forsberg*, for respondent.

### CONTENTS

FINDINGS OF FACT ................................................................ 232

TMBCI and its corporations ................................................. 233
Uniband, Inc. ......................................................................... 233
TMMC ..................................................................................... 236
The section 17 corporation .................................................. 237
The tax returns ..................................................................... 239
Indian employment credit .................................................... 240

OPINION ................................................................................ 241

I.  Federal income tax exemption issue ............................. 241
   A.  Indian tribes are not subject to Federal income tax. ............... 241
      1.  TMBCI has no inherent immunity from Federal taxes. ....... 241
      2.  No treaty exempts TMBCI from Federal income tax. ........... 242
         a.  An exemption must be "definitely expressed". ................... 243
         b.  The cited treaties do not express an income tax exemption. ................................................................... 243
      3.  The Code does not impose income tax liability on TMBCI.  .. 244
   B.  Uniband does not share TMBCI's "exemption" from Federal income tax. ................................................................... 246
      1.  Apart from its association with TMBCI, Uniband is taxable. ...................................................................... 246
      2.  As a general rule, corporations are distinct from their owners for tax purposes. ....................................... 246
      3.  Uniband is not an "integral part" of TMBCI. ......................... 247
         a.  Authorities addressing integral parts of States ................. 248
         b.  Sovereign immunity ............................................................. 249
         (1)  Analysis of sovereign immunity ....................................... 250
            (a)  Arm of the tribe .................................................... 251
            (b)  Tribal establishment ............................................ 252
            (c)  Other criteria .................................................... 253
         (2)  Sovereign immunity does not necessarily confer "integral part" status. ..................................................... 256
         c.  "Indian tribal organization" ............................................... 258
         d.  Similarity to section 17 corporations ............................... 259
         (1)  The origin of section 17 corporations ............................... 261
         (2)  Characteristics of section 17 corporations ......................... 261
         (3)  Taxation of section 17 corporations ................................. 262

    (4)  Uniband's differences from a section 17 corporation  ........  263
II.   Consolidated return issue  ...............................................  264
  A.   Uniband was not part of an affiliated group.  ...........................  265
    1.  Body politic  ................................................  266
    2.  An entity taxed as a corporation  ...........................................  266
  B.   The consolidated returns were not valid.  .................................  267
    1.  TMBCI did not make the consolidated returns.  ....................  267
    2.  TMBCI did not consent to the consolidated returns.  ............  267
    3.  TMBCI did not report its items on the consolidated
        returns for 1996 or 1997.  .....................................  269

III. Wage deduction reduction issue  .....................................................  270

IV. Conclusion  ........................................................................................  273

GUSTAFSON, *Judge*: In a notice of deficiency mailed to petitioner Uniband, Inc. ("Uniband"), pursuant to section 6212[1] on November 28, 2005, the Internal Revenue Service ("IRS") determined income tax deficiencies of $220,851 for 1996, $754,758 for 1997, and $308,498 for 1998. Uniband timely filed a petition requesting this Court to redetermine those deficiencies. After concessions by the parties three issues remain for decision:

(1) Whether Uniband, as a State-chartered corporation wholly owned by an Indian tribe, is subject to the corporate income tax under section 11. We hold that it is subject to tax.

(2) Whether, if Uniband is subject to tax, the consolidated returns that Uniband and its sister corporation joined in filing for 1996, 1997, and 1998 were valid under section 1501. We hold that they were not valid.

(3) Whether section 280C(a) requires that Uniband's section 162 deductions for wage and employee expenses be reduced by the entire amount of the Indian employment credit for which Uniband was eligible under section 45A(a), even if Uniband did not claim the credit. We hold that it does require the reduction.

### FINDINGS OF FACT

The parties submitted this case fully stipulated pursuant to Rule 122.[2] The parties' stipulated facts are incorporated

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (codified in 26 U.S.C. and referred to herein as "the Code"), and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The burden of proof is generally on the taxpayer, *see* Rule 142(a)(1),

herein by this reference. At the time Uniband filed its petition, it maintained its principal place of business in Belcourt, North Dakota.

## TMBCI and its corporations

The Turtle Mountain Band of Chippewa Indians ("TMBCI" or "the Band") is a federally recognized, unincorporated band of Indians acting under a revised constitution and bylaws approved by the Secretary of the Interior on June 16, 1959. TMBCI's reservation is approximately 68 square miles and is in Rolette County, North Dakota. Belcourt, North Dakota, is on the reservation. TMBCI has never filed a Federal income tax return on its own behalf or on behalf of any other entity.

For the years in issue, TMBCI was the sole owner of three corporations relevant in this case: (1) petitioner Uniband, Inc., chartered in Delaware; (2) Turtle Mountain Manufacturing Co. ("TMMC"), chartered in North Dakota; and (3) a federally chartered corporation that was also named Uniband Corp. and that we refer to here as the "section 17 corporation" for reasons we explain below. [3]

## Uniband, Inc.

Petitioner Uniband, Inc., was incorporated under the laws of Delaware on July 28, 1987. From then until September 1990, TMBCI owned 51% of Uniband's stock, and the remaining 49% was owned by Unibase Technologies, Inc., a Delaware corporation in which TMBCI had no ownership interest. Since September 1990, TMBCI has been the 100% owner of Uniband's stock.

The record indicates that Uniband was engaged in commercial activities. In its brief Uniband states that it regularly performed data entry services for several Federal Government agencies. Uniband cites no evidence for this proposition, but we assume it is true.

---

and the submission of a case fully stipulated under Rule 122 does not alter that burden, *see Borchers v. Commissioner*, 95 T.C. 82, 91 (1990), *aff'd*, 943 F.2d 22 (8th Cir. 1991).

[3] The record indicates that TMBCI was also the sole owner of Uniband Tribal Corp., a corporation chartered under tribal law. That tribal corporation is not relevant in this case.

Uniband's original certificate of incorporation states:

The nature of the business and the purpose to be conducted or promoted by the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.[4]

No provision in Uniband's articles of incorporation or bylaws further restricts the activities of the corporation. The certificate gives Uniband's board of directors the unilateral power to "make, alter or repeal the By-Laws of the corporation." The certificate of incorporation also reserves the corporation's right "to amend, alter, change or repeal any provision contained in this Certificate of Incorporation". In March 1991, Uniband exercised that right and filed a restated certificate of incorporation with the Delaware secretary of state. The restated certificate added an "Article Ninth" entitled "Waiver of Sovereign Immunity", under which Uniband is able—

To sue and to be sued in courts of competent jurisdiction within the United States, * * * over all matters relating to the Corporation's relationship with the United States Small Business Administration (SBA) * * *.

With regard to Uniband's management, Uniband's bylaws adopted February 28, 1991, provide:

Section 3.11 *Election of Directors*. At each election of Directors every shareholder having the right to vote in that election shall be afforded the right to vote the number of shares owned by him, either in person or by proxy, for as many persons as there are Directors to be elected. The candidate receiving the highest number of votes shall be deemed to be elected. * * *

\* \* \* \* \* \* \*

Section 4.1 *Exercise of Corporate Power*. The business affairs of the corporation shall be managed by the Board of Directors (hereinafter, the Board).

---

[4] The certificate as restated in 1991 apparently deleted words from this provision, presumably inadvertently, so that it thereafter read: "The nature of the business and the purpose to be conducted or promoted by the corporations [apparent deletion] may be organized under the General Corporation Law of the State of Delaware."

Section 4.2 *Qualifications*. Directors need not be residents of Delaware or shareholders of the corporation. They need have no other qualifications.

\* \* \* \* \* \* \*

Section 16.1 *Waiver of Sovereign Immunity*. The corporation may sue and be sued in courts of competent jurisdiction within the United States, including, but not limited to, United States federal courts; provided however, that the grant or exercise of such power to sue or be sued shall not be deemed a consent by the Turtle Mountain Band of Chippewa Indians ("Tribe") to the levy of any judgment, lien, attachment or other encumbrance upon any property of the Tribe other than property specifically pledge or assigned by the Tribe.

All inherent sovereign rights of the Tribe as a federally recognized Indian tribe with respect to the existence and activities of the corporation are hereby expressly reserved, including sovereign immunity from suit in any state, federal or tribal court. Nothing in these By-Laws nor any action of the Board of Directors, shareholders, officers, agents or employees of the corporation shall waive the sovereign immunity from suit of the Tribe, or to be a consent of the Tribe to the jurisdiction of the United States or of any state or any tribe with regard to any activities of the Tribe, or to be a consent of the Tribe to any cause of action, case or controversy, or to the levy of any judgment, lien or attachment upon any property of the Tribe; or a consent to suit in respect with any land within the exterior boundries [sic] of the Tribe's Reservation, or an consent to any alienation, attachment or encumbrance of such lands.

Nothing in there [sic] By-Laws nor any activity of the corporation shall implicate or in any way involve the credit of the Tribe.

The corporation shall have only those assets acquired by it in the name of the corporation. No activity of the corporation nor any indebtedness incurred by the corporation shall implicate or in any way involve any assets of tribal members or the Tribe not assigned or otherwise transferred in writing to the corporation in its corporate name.

Our record does not show who Uniband's officers and directors were during the years at issue, nor whether they were members of TMBCI.

Neither Uniband's restated certificate of incorporation nor its bylaws set forth any limitations on the alienation of Uniband shares, and our record includes no Uniband shareholder agreement imposing any such limitation. Uniband's restated certificate of incorporation and its bylaws do not place any restrictions on when or under what circumstances Uniband may dissolve.

Apart from the fact that TMBCI is its sole shareholder, Uniband has not offered any evidence regarding the financial relationship between TMBCI and Uniband. In particular, the record does not show any contributions of capital that TMBCI made to Uniband, does not show any loan guaranties by TMBCI, and shows no liability on TMBCI's part for any debt of Uniband; and section 16.1 of the bylaws (quoted above) explicitly provides that TMBCI will not be liable for Uniband's debts. Uniband maintained its principal place of business within TMBCI's reservation, but we cannot tell whether Uniband conducted any activity or had any assets outside of the reservation. A portion of Uniband's workforce were TMBCI members; however, our record does not indicate how many TMBCI members Uniband employed for the years in issue.[5]

Uniband uses the accrual method of accounting for both tax and financial reporting purposes and has a taxable year ending October 31. During the years in issue, Uniband treated itself as a C corporation, though it now maintains that it is not subject to corporate income tax. At no point has Uniband owned any shares of TMMC.

*TMMC*

TMMC is a North Dakota corporation, incorporated in January 1979. From TMMC's creation through April 1989, TMBCI indirectly owned at least 51% of TMMC. In May 1989, TMBCI became TMMC's sole shareholder. At all times since incorporation, TMMC has used the accrual method of accounting for both tax and financial reporting purposes and has had a fiscal and taxable year ending September 30. Through the years in issue TMMC has treated itself as a C corporation. At no point has TMMC owned any shares of Uniband.

---

[5] The parties have stipulated that for Uniband's 1998 taxable year, it paid about $4.5 million in "qualified wages" and "qualified employee health insurance costs" (as defined by section 45A(b)(1) and (2)) to members of TMBCI. However, that amount appears to account for less than a quarter of Uniband's total employee expenses of $29 million: Uniband on its 1998 returns deducted $1.5 million for "salaries and wages" and included, in its cost of goods sold, $16.7 million for "cost of labor" and $10.8 million for "contract labor". These figures suggest that Uniband employed significant numbers of persons who were not TMBCI members.

*The section 17 corporation*

On September 23, 1998, the Secretary of the Interior, pursuant to section 17 of the Indian Reorganization Act of 1934 ("IRA"), ch. 576, sec. 17, 48 Stat. at 988 (codified as amended at 25 U.S.C. sec. 477 (1994)), granted to TMBCI a Federal charter of incorporation for a so-called section 17 corporation. The charter is different in material respects from Uniband's certificate of incorporation and provides in pertinent part:

1. *Issuance of Charter.*

The Secretary of the Interior issues this charter of incorporation ("Charter") to the Turtle Mountain Band of Chippewa Indians ("Tribe") * * * . This Charter shall become operative when ratified by the governing body of the Tribe, its Tribal Council.

\* \* \* \* \* \* \*

3. *Tribal Ownership; Exercised by Tribal Council; No Tribal Liability.*

The [section 17] Corporation shall be wholly owned by the Tribe. The rights, duties and prerogatives of the Tribe as sole owner of the Corporation shall be exercised and performed on behalf of the Tribe by its Tribal Council * * *.

\* \* \* \* \* \* \*

6. *Reorganization of State Corporation, Uniband, Inc., or Tribal Corporation, Uniband Tribal Corporation.*

As an initial matter, the [section 17] Corporation has been organized as a vehicle for reorganization of Uniband, Inc., a Delaware corporation [i.e., petitioner] wholly owned by the Tribe, and/or Uniband Tribal Corporation, a tribally-chartered corporation wholly owned by the Tribe. To that end, this [section 17] Corporation is authorized to acquire the assets and liabilities of Uniband, Inc. and/or Uniband Tribal Corporation by merger, consolidation, exchange, transfer, stock acquisition or other means, and to thereafter carry on all or any part of the business of Uniband, Inc. and/or Uniband Tribal Corporation, in the name of this [section 17] Corporation.

\* \* \* \* \* \* \*

8. *Generic Powers.*

a. *Powers under Section 17.* The [section 17] Corporation shall have * * * the power to purchase trust or restricted Indian lands and to issue in exchange therefor interests in Corporate property * * *, *provided* the Corporation shall have no authority to sell, mortgage, or lease for a

period exceeding twenty-five years any trust or restricted lands owned by the Corporation that are within the Reservation.

\* \* \* \* \* \* \*

13. *Board of Directors.*

The business and affairs of the [section 17] Corporation shall be managed by a board of directors ("Board of Directors" or "Board") in accordance with the following provisions:

a. *Composition, Appointment and Designation of Chairman.* There shall be five Board seats. The Tribal Council shall appoint one person ("Director") to fill each open Board seat and shall designate one Director as Chairman of the Board \* \* \*

b. *Qualifications.*

(1) To be eligible to serve as a Director, a person must:
—not be a member of the Tribal Council; \* \* \*
(2) At least a majority of the Directors must be enrolled members of the Tribe.

\* \* \* \* \* \* \*

22. *By-Laws.*

The Board of Directors may adopt, amend, or repeal by-laws of the [section 17] Corporation, *provided* the by-laws may not contain provisions inconsistent with the provisions of this Charter or applicable law.

23. *Amendment.*

As provided in Section 17 of the IRA, this Charter may be amended by the Secretary of the Interior upon petition by the Tribe, *provided* an amended charter shall not be effective until ratified by the Tribal Council.

The charter also provided that TMBCI's section 17 corporation could sue and "by explicit resolution of the Corporation's Board of Directors, waive the Corporation's immunity from suit". By tribal Resolution Number TMBC 1121–10–98, TMBCI's tribal council ratified this charter on October 2, 1998.

However, the parties stipulate that as of the filing of the petition in this case, TMBCI's section 17 corporation has not merged with Uniband. Thus, the "Reorganization" authorized in section 6 of the charter, quoted above, has never taken place. [6]

---

[6] Rev. Rul. 94–65, 1994–2 C.B. 14, stated that the IRS would not challenge the exemption from tax of a tribe's wholly owned State-chartered corporation's income earned after September 30, 1994, if the tribe could demonstrate (in an application for relief under section 7805(b)) that it was in good faith seeking to comply with Rev. Rul. 94–16, 1994–1 C.B. 19, by dis-

*The tax returns*

The parties have stipulated that TMBCI itself has not filed any Federal income tax returns.

Uniband and TMMC filed the following separate Forms 1120, "U.S. Corporation Income Tax Return", for the years 1995 and 1996:

*Separately filed returns*

| Form | Filing corporation | TYE | Filed |
|------|--------------------|-----|-------|
| 1120 | Uniband | Oct. 31, 1995 | July 1996 |
| 1120 | Uniband | Oct. 31, 1996 | Feb. 1997 |
| 1120 | TMMC | Sept. 30, 1996 | Aug. 1997 |

Although the return is not in our record, TMMC appears to have also filed a nonconsolidated corporate return for its taxable year ended September 30, 1995. In any event, the two corporations filed separately, with different taxable years.

Thereafter Uniband filed purported consolidated Federal corporate income tax returns for the years 1995 through 1998, as follows:

*Consolidated returns*

| Form | Filing corporation | Other included entities | TYE | Filed |
|------|--------------------|------------------------|-----|-------|
| 1120 | Uniband | TMMC | Oct. 31, 1997 | July 1998 |
| 1120X | Uniband | TMMC | Oct. 31, 1995 | Sept. 1998 |
| 1120X | Uniband | TMMC | Oct. 31, 1996 | Sept. 1998 |
| 1120 | Uniband | TMMC | Oct. 31, 1998 | July 1999 |
| 1120X | Uniband | TMMC and TMBCI | Oct. 31, 1998 | Aug. 1999 |

With the exception of the 1998 Form 1120X, "Amended U.S. Corporation Income Tax Return", none of the consolidated returns filed for the years in issue contained information regarding TMBCI or its tax attributes; and each return on its respective Form 851, "Affiliations Schedule", reported Uniband and not TMBCI as the common parent of TMMC.[7]

solving its State-chartered corporation and organizing as a section 17 corporation. Uniband filed such an application under section 7805(b) on August 4, 2009 (more than three years after filing this suit), but after learning that the IRS intended to rule adversely on the request, Uniband withdrew its ruling request in January 2010.

[7] The affiliation schedule attached to the 1995 Form 1120X (a year not

Continued

The 1998 Form 1120X, like the filings before it, listed the name of the taxpayer as "Uniband, Inc.", and it made no changes to taxable income or tax; but it amended the Form 851 to show TMBCI as owning 100% of both Uniband and TMMC. Also, the consolidation schedules attached to the 1998 Form 1120X were amended to include for the first time a column for "Turtle Mountain Band of Chippewa Indians"— but with zeros entered on each line in the column for TMBCI. In a statement attached to the 1998 amended return, Uniband explained:

> This amended return is being filed to report the income and deductions of two wholly owned subsidiary corporations of the Turtle Mountain Band of Chippewa Indians, EIN - * * *. The two corporations are Uniband, Inc. - EIN * * * and Turtle Mountain Manufacturing Co, Inc. - EIN * * *. On the original 1120 income tax return, the Form 851 incorrectly reported Turtle Mountain Manufacturing as being wholly owned by Uniband, Inc. The common owner of the two corporations is the Turtle Mountain Band of Chippewa Indians. Enclosed is an amended affiliations schedule, Form 851, which correctly reports the Turtle Mountain Band of Chippewa Indians as the common parent and Uniband, Inc. and Turtle Mountain Manufacturing Co., Inc. as the subsidiary corporations. [Original in all capitals.]

The consolidated returns all had one intended and claimed effect—i.e., to largely offset Uniband's income with TMMC's losses, resulting in little or no claimed tax liability for the supposed consolidated group. The IRS determined that the consolidated returns filed for the years in issue were not appropriate filings and that Uniband's tax liability should be calculated on a separate basis from TMMC's, resulting in deficiencies for Uniband.

*Indian employment credit*

On both its original and amended returns Uniband deducted what appears to be the entirety of its salary, wage, and other employee expenses (not reduced by any credit

---

before us) showed TMBCI as the common parent of the group and Uniband and TMMC as wholly owned subsidiaries of TMBCI. Although the explanation attached to the 1996 amended return did disclose that Uniband and TMMC were owned by TMBCI, it also stated that "[t]he Taxpayer, Uniband, Inc. * * * is amending this 1120 tax return for the year ended October 31, 1996 to include the taxable income of its subsidiary, Turtle Mountain Manufacturing Co., Inc."

amount), and the parties have stipulated the pertinent amounts for each relevant year. On its returns Uniband did not claim any general business credits (in particular, the Indian employment credit provided in section 45A). The IRS determined, however, that Uniband was entitled to the Indian employment credit determined under section 45A, reduced by the credit limitations set forth in section 38(c) (in amounts not in dispute here). To Uniband's advantage, the IRS applied that limited credit against Uniband's determined tax liability; but to Uniband's greater *dis*advantage, the IRS reduced Uniband's deductible wages by the credit amount determined under section 45A.

The net result of the IRS's adjustments (i.e., the allowance of the limited Indian employment credits and the reduction of wage deductions) resulted in greater tax deficiencies for Uniband. Uniband now challenges the IRS's deficiency determinations.

## OPINION

### I. *Federal income tax exemption issue*

Uniband begins by arguing that the deficiencies that the IRS determined are incorrect because Uniband is exempt from tax (and that Uniband itself erred by filing returns for the years at issue as if it were a taxable C corporation). Uniband contends that as an integral part of its owner, TMBCI—a federally recognized Indian tribe—Uniband shares in TMBCI's immunity from Federal income tax. The Commissioner agrees that TMBCI is not subject to Federal income tax but asserts that Uniband is a separate taxable entity that is subject to income tax.

#### A. *Indian tribes are not subject to Federal income tax.*

The parties agree that federally recognized Indian tribes are not subject to Federal income tax; but they disagree about why. Resolving that dispute will help us to resolve the arguments advanced in this case.

##### 1. *TMBCI has no inherent immunity from Federal taxes.*

Uniband asserts that its owner TMBCI possesses an "inherent sovereignty and immunity from the federal income

tax" (which Uniband contends it shares). This is incorrect. As the Supreme Court has explained:

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status. * * * [*United States v. Wheeler*, 435 U.S. 313, 323 (1978).]

Thus, if and when Congress acts to subject Indian tribes to Federal tax liability, they become liable—for example, for the Federal excise tax on wagering under section 4401(c), *see Chickasaw Nation v. United States*, 534 U.S. 84 (2001), *aff'g* 208 F.3d 871, 878–879 (10th Cir. 2000); for other excise taxes, *see, e.g.*, *Confederated Tribes of the Warm Springs Reservation of Or. v. Kurtz*, 691 F.2d 878 (9th Cir. 1982) (holding a tribe subject to "(1) a tax on the use of certain highway motor vehicles, 26 U.S.C. § 4481(a); (2) a tax on diesel fuel used in highway vehicles, 26 U.S.C. § 4041(a); (3) a tax on special fuels used in motor vehicles, 26 U.S.C. § 4041(b); and (4) a tax on manufacturing, in this case a truck chassis assembled by the Tribe, 26 U.S.C. §§ 4061(a), 4218(a)"); or for tax under section 511(a)(2)(b) on the unrelated business income of tribally owned colleges or universities, *see* sec. 7871(a)(5). TMBCI has no "inherent" immunity from Federal income tax that Uniband could share.

2. *No treaty exempts TMBCI from Federal income tax.*

Next Uniband asserts that TMBCI has an exemption from income tax (which exemption Uniband contends it shares) by virtue of treaties into which it has entered with the United States.[8] Uniband cites six treaties[9] generally as the basis for

---

[8] Uniband contends that "[a] close reading of those treaties shows that * * * [TMBCI] *has not consented* to imposition of the federal income tax on itself or on those entities that comprise its constituent parts." (Emphasis added.) To the extent Uniband argues TMBCI is inherently exempt from Federal tax unless it consents to be taxed, that argument is answered in part I.A.1 above.

[9] The treaties relied upon by Uniband are: (1) 1795 Treaty with the Wyandots, Etc., Aug. 3, 1795, 7 Stat. 49; (2) 1815 Treaty with the Wyandot, Etc., Sept. 8, 1815, 7 Stat. 131; (3) Treaty with the Sioux, Etc., Aug. 19, 1825, 7 Stat. 272; (4) Treaty with the Chippewa, Aug. 5, 1826, 7 Stat. 290;

its claim for exemption from corporate income tax and points to two particular treaty provisions. Uniband's treaty arguments have previously been rejected, as we discuss below.

a. *An exemption must be "definitely expressed".*

We generally construe statutes and treaties in favor of Indians, *see Choate v. Trapp*, 224 U.S. 665, 675 (1912); *Jourdain v. Commissioner*, 71 T.C. 980, 990 (1979), *aff'd*, 617 F.2d 507 (8th Cir. 1980); and a tax exemption will be held to exist where a statute or treaty contains "express exemptive language", *United States v. Anderson*, 625 F.2d 910, 913 (9th Cir. 1980). However, we cannot use this canon "to create favorable rules" for Indians, *Jourdain v. Commissioner*, 71 T.C. at 990; and in the absence of a "'definitely expressed' exemption", Indians are subject to taxation, *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156 (1973) (quoting *Choteau v. Burnet*, 283 U.S. 691, 696–697 (1931)).

b. *The cited treaties do not express an income tax exemption.*

To support its treaty argument, Uniband points to two particular provisions in the treaties. Uniband first relies on the following language from article 5 of the 1795 Treaty with the Wyandot, Etc., Aug. 3, 1795, 7 Stat. 49, 52 ("Treaty of Greenville"):

> To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared, that the meaning of that relinquishment is this: The Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, *without any molestation from the United States* * * *. [Emphasis added.]

When previously presented with the issue of whether the "molestation" provision in the Treaty of Greenville exempts individual Indians from Federal income tax, we concluded: "It is apparent that the molestation the parties had in mind was interference in the Indians' rights to hunt, etc., not the right to be free from taxation." *Jourdain v. Commissioner*, 71 T.C. at 990.

_____

(5) Treaty with the Chippewa, Red Lake and Pembina Bands, Oct. 2, 1863, 13 Stat. 667; and (6) 1892 Agreement with Turtle Mountain Band, Act of April 21, 1904, ch. 1402, 33 Stat. 189, 194–196.

Second, Uniband cites the 1892 Agreement with Turtle Mountain Band, Act of April 21, 1904, ch. 1402, 33 Stat. 189, 194–196 ("Turtle Mountain Agreement"), which was entered into by the United States and TMBCI on October 2, 1892, and provides in article VII:

> So long as the United States retains and holds the title to any land in the use or occupation of any member of the Turtle Mountain [B]and of Chippewa Indians or the title to other property in the possession of any Indian of said band, which it may do for twenty years, *there shall be no tax or other duty levied or assessed upon the property*, the title to which is held or retained by the United States. [Emphasis added.]

Regarding the "no tax or other duty" clause in article VII, we have observed that "[t]his treaty provision refers to a tax upon the property for a 20-year period. Neither this provision nor any of the other treaties cited by petitioner provide to the Turtle Mountain Band of Chippewas a blanket exemption from Federal income tax on all income." *LaFontaine v. Commissioner*, T.C. Memo. 1975–165, *aff'd per curiam*, 533 F.2d 382 (8th Cir. 1976). The treaty precludes tax on certain property "held or retained by the United States"; it says nothing about income tax or any exemption therefrom.

TMBCI thus has no treaty immunity from Federal income tax that Uniband could share.

   3. *The Code does not impose income tax liability on TMBCI*.

Income tax is imposed in section 1 on "individuals" and in section 11 on "corporations"; but as an Indian tribe, TMBCI is neither an individual nor (since it has not been incorporated) a corporation. *See* part II.A. below.

It is true that the tax law defines "corporations" broadly enough that the term "includes associations", sec. 7701(a)(3); but any argument that TMBCI should be taxable as a "corporation" because it is an "association" would fail in view of the Commissioner's concession reflected in his public rulings, *see* note 10 below. Moreover, the Supreme Court has rejected the characterization of an Indian tribe as a mere association. In *United States v. Mazurie*, 487 F.2d 14, 19 (10th Cir. 1973), *rev'd*, 419 U.S. 544 (1975), the Court of Appeals acknowledged that Indian tribes are "very important organizations which exercise a broad tribal authority over their members"

but observed that "[t]ribal members are citizens of the United States" and had characterized the tribe as "an association of citizens". The Supreme Court countered "that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory" and "that Indian tribes within 'Indian country' are a good deal more than 'private, voluntary organizations'". *Mazurie*, 419 U.S. at 557.

Thus, the reason TMBCI is not subject to Federal income tax is not that Indian tribes are inherently immune from Federal income tax, nor that they have been exempted from Federal income tax by treaty or statute, but rather simply that Congress has never imposed the Federal income tax on Indian tribes. For decades the Commissioner's position has reflected this truism. [10]

However, the persistence of this circumstance of nonliability over so many decades shows that it can hardly be the result of congressional oversight but must instead be deliberate. Thus, while there is no positive provision in the Code exempting Indian tribes from the income tax, Congress's persistent exclusion of them from the Federal income tax regime may be thought of as an "exemption", and the Commissioner's briefs refer to it as such. Uniband argues that TMBCI's "exemption" (however it arises) extends to Uniband—either as an "integral part" of TMBCI or as the equivalent of a section 17 corporation of TMBCI—and we now turn to that argument.

---

[10] *See* Rev. Rul. 94–16, 1994–1 C.B. at 20 ("Because an Indian tribe is not a taxable entity, any income earned by an unincorporated tribe * * * is not subject to federal income tax"); Rev. Rul. 81–295, 1981–2 C.B. 15, 16 ("no tax liability has been asserted against a tribe with respect to tribal income from activities carried on within the boundaries of the reservation"); Rev. Rul. 67–284, 1967–2 C.B. 55, 58 ("Income tax statutes do not tax Indian tribes. The tribe is not a taxable entity"); *see also* H.R. Conf. Rept. No. 97–984, at 16 (1982), 1983–1 C.B. 522, 523 ("The amendment does not change the present income tax treatment of Indian tribal governments specified in Rev. Rul. 67–284"); Staff of J. Comm. on Taxation, "Overview of Federal Tax Provisions and Analysis of Selected Issues Relating To Native American Tribes and Their Members" 3–4 (J. Comm. Print 2012).

B. *Uniband does not share TMBCI's "exemption" from Federal income tax.*

1. *Apart from its association with TMBCI, Uniband is taxable.*

TMBCI is an Indian tribe; and, as we have shown, the income tax has not been imposed on Indian tribes. Uniband, however, is not a tribe but a corporation; and section 11 provides: "A tax *is hereby imposed* for each taxable year on the taxable income of *every corporation*." (Emphasis added.) As the U.S. Court of Appeals for the Ninth Circuit observed in *Commissioner v. Walker*, 326 F.2d 261, 263 (9th Cir. 1964), *aff'g in part, rev'g in part* 37 T.C. 962 (1962):

> A general Act of Congress applying to all persons includes Indians and their property interests. *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960). Sections 1 and 61(a) of the Internal Revenue Code of 1954 subject the income of "every individual" to tax, and include income "from any source whatever", that is not elsewhere specifically excluded. Because the Internal Revenue Code is a general Act of Congress, it follows that Indians are subject to payment of federal income taxes, as are other citizens, unless an exemption from taxation can be found in the language of a Treaty or Act of Congress. * * *

We can likewise observe that sections *11* and 61(a) of the Code are general, apply to all persons, and subject the income of "every corporation" to income tax, so that corporations owned by Indians or Indian tribes are subject to payment of Federal income taxes, as are other corporations, "unless an exemption from taxation can be found in the language of a Treaty or Act of Congress." *Commissioner v. Walker*, 326 F.2d at 263. We have already seen that no treaty provides such an exemption for TMBCI (or Uniband), and we now consider Uniband's arguments to determine whether an "Act of Congress"—i.e., the Code, as properly construed and applied—provides such an exemption for Uniband, notwithstanding the general language of section 11.

2. *As a general rule, corporations are distinct from their owners for tax purposes.*

Under any rationale, the argument that Uniband obtains an exemption by virtue of its association with its owner TMBCI is in tension with a basic principle of tax law—i.e.,

that a corporation is treated as distinct from its share-holders. *See Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 438–439 (1943). Under this general rule, Uniband as a State-chartered corporation is a separate taxable entity and is distinct from its sole shareholder, TMBCI.

However, this general rule admits exceptions:

> An entity formed under local law is not always recognized as a separate entity for federal tax purposes. For example, an organization wholly owned by a State is not recognized as a separate entity for federal tax purposes if it is an integral part of the State. Similarly, tribes incorporated under section 17 of the Indian Reorganization Act of 1934, as amended, 25 U.S.C. 477, or under section 3 of the Oklahoma Indian Welfare Act, as amended, 25 U.S.C. 503, are not recognized as separate entities for federal tax purposes. [26 C.F.R. sec. 301.7701–1(a)(3), Proced. & Admin. Regs.]

This regulation mentions the twofold basis for Uniband's argument—"integral part" and section 17 of the IRA.

### 3. *Uniband is not an "integral part" of TMBCI*.

Uniband argues that it is an "integral part"[11] of TMBCI and should therefore share in TMBCI's exemption from Federal income tax, notwithstanding its ostensibly distinct corporate status. We note that the regulation quoted above states an exception for "an integral part *of the State*" (emphasis added); but an Indian tribe is not a State. *See, e.g.*, *Chickasaw Nation*, 534 U.S. at 86 (holding Indian tribes subject to gambling-related taxes from which States are exempt); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States*, 845 F.2d 139, 143–144 (7th Cir. 1988); *Confederated Tribes of Warm Springs Reservation of Or.*, 691 F.2d at 880 ("Tribal governments, while possessing aspects of self-rule, thus are quite distinct from the several states"). However, Uniband contends that the same reasoning that treats a State as including the State's integral parts should result in treating an Indian tribe as including the tribe's integral parts. Assuming this contention is cor-

---

[11] Uniband states this contention in various ways—that it is an "integral part" of TMBCI, an "integral and constituent part" of TMBCI, and an "arm" of TMBCI. But its most frequent contention is that it is an "integral part", for which term there is authority, i.e., 26 C.F.R. sec. 301.7701–1(a)(3), Proced. & Admin. Regs., that can be consulted to analyze Uniband's status, so we consider the argument under that rubric.

rect, [12] the issue becomes whether Uniband is an integral part of TMBCI, and Uniband's argument cites four strands of authority in favor of that status:

### a. *Authorities addressing integral parts of States*

Uniband points to State-affiliated entities that have been held not subject to tax and argues that its relation to TMBCI makes it equivalent to those entities. In support of this argument Uniband cites *Michigan v. United States*, 40 F.3d 817, 823 (6th Cir. 1994), and administrative rulings cited threat. [13] In *Michigan v. United States*, the Government argued that an education trust created by the Michigan legislature was subject to corporate income tax. The Court of Appeals for the Sixth Circuit rejected the Government's argument, concluding instead that the trust was an "integral part of the state". *Id.* at 823. In reaching this conclusion, the Court of Appeals engaged in a fact-intensive analysis, *id.* at 826–827, based on criteria given in Revenue Ruling 57–128, 1957–1 C.B. 311, 312. That ruling stated:

> In cases involving the status of an organization as an instrumentality of one or more states or political subdivisions, the following factors are taken into consideration: (1) whether it is used for a governmental purpose and performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses.

These six criteria are largely answered in the negative in Uniband's situation. (1) Even though Uniband is an important source of employment for TMBCI members, Uniband is still a commercial venture and does not perform a "govern-

---

[12] We assume but do not decide that a tribe may have "integral parts" that share the tribe's non-liability for Federal income tax. The language of 26 C.F.R. sec. 301.7701–1(a)(3) is exemplary and non-exclusive, making it reasonable to argue that the situation of a State's integral parts is analogous to the situation of an Indian tribe's integral parts.

[13] *See* Rev. Rul. 87–2, 1987–1 C.B. 18; Rev. Rul. 71–131, 1971–1 C.B. 29; Rev. Rul. 71–132, 1971–1 C.B. 29; G.C.M. 14,407, 1935–1 C.B. 103.

mental function". (2) Although one can say that Uniband, in pursuing its business, in a sense "function[s] * * * on behalf of" TMBCI (as in the second factor listed above), one must say more precisely that like any corporation Uniband functions in its own name and on its own behalf, paying its profits to its shareholder. (3) There are currently no "private interests involved" in Uniband, since TMBCI is currently its sole shareholder; but it was not until three years after Uniband was incorporated that TMBCI became Uniband's sole shareholder, and there is nothing that prevents TMBCI from selling some or all of its Uniband shares. (4) The "control and supervision" of Uniband can be said to be "vested in public [tribal] authorities" only in the sense that, as sole shareholder, the tribe has the ultimate power to name the officers and directors of Uniband. However, there is nothing in Uniband's corporate charter or bylaws that gives TMBCI's council authority to directly manage the operations of Uniband or supersede the action of the board of directors, nor is there any requirement that TMBCI members be on the board. (5) There is no "express statutory authority" that created Uniband or "provided for [its] * * * management". On the contrary, TMBCI's ability to control or abolish Uniband arises not from statute but from TMBCI's power as Uniband's sole shareholder. (6) Nothing in our record suggests that, in its day-to-day operations, Uniband lacks "financial autonomy" from TMBCI or depends on it as a "source of its operating expenses".

Considering all the facts and circumstances, we find that Uniband is readily distinguishable from the educational trust in *Michigan v. United States*, 40 F.3d 817, and the other entities that have been held to be integral parts of their sovereigns, and conclude that Uniband is not an integral part of TMBCI.

b. *Sovereign immunity*

In support of its "integral part" argument, Uniband contends that it has sovereign immunity that it derives from TMBCI because it is an integral part of TMBCI. However, this argument has two flaws: (1) Uniband has failed to establish that it possesses sovereign immunity and (2) Uniband has not established that being entitled to sovereign immunity

means it would be an integral part of TMBCI for Federal tax purposes. First, Uniband essentially assumes that it has sovereign immunity, without offering adequate analysis. It argues:

> Federal case law, however, makes it clear that a wholly owned corporation operates as an arm of the tribe and has sovereign immunity. Br. for Pet., p. 23–24. Obviously, sovereign immunity, enjoyed only by governments, extends to Petitioner because it is an integral part of the Tribe. Petitioner made a limited waiver of its sovereign immunity in article nine of its restated articles of incorporation. Ex. 2–J. The waiver establishes that Petitioner, as an arm of the Tribe, had sovereign immunity.

Uniband does cite cases in which a tribally owned corporation is held to have sovereign immunity;[14] but it is clear that not every tribal organization has sovereign immunity;[15] and Uniband provides essentially no analysis to show that it is the sort of entity that does. Rather, Uniband seems to assume that its purported *waiver* of sovereign immunity (in its certificate of incorporation) could establish that it *possesses* sovereign immunity—but that could hardly be so. We therefore must analyze further Uniband's entitlement to sovereign immunity.

(1) *Analysis of sovereign immunity*

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). This immunity can extend to both business and governmental activities of the tribe, *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 758–760 (1998); and the Court of Appeals for the Eighth Circuit (to which an appeal in this case would apparently lie) has held that "a tribe's sov-

---

[14] We are aware of only a few cases holding that a State-chartered corporation (like Uniband) is entitled to tribal sovereign immunity. *See J.L. Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd.*, 842 F. Supp. 2d 1163, 1176 (D.S.D. 2012); *Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.*, 658 N.E.2d 989, 993 (N.Y. 1995). It appears that being incorporated under State law rather than tribal law "militate[s] against sovereign immunity". *J.L. Ward Assocs.*, 842 F. Supp. 2d at 1176.

[15] *See Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1150 (10th Cir. 2012) ("a separate legal entity organized under the laws of another sovereign, Oklahoma, cannot share in the Nation's [i.e., the tribe's] immunity from suit").

ereign immunity *may* extend to tribal agencies", *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) (emphasis added) (citing *Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d 581, 583 (8th Cir. 1998)).

Although the Court of Appeals for the Eighth Circuit has not adopted specific criteria to determine whether an organization is entitled to tribal sovereign immunity, it has considered whether the organization serves as an "arm of the tribe" and whether a tribal council established the organization pursuant to the council's power of self-government. [16] We will therefore consider those criteria.

(a) *Arm of the tribe*

"A subdivision of tribal government or a corporation attached to a tribe may be so closely allied with and dependent upon the tribe that it is effectively an arm of the tribe. It is then actually a part of the tribe per se, and, thus, clothed with tribal immunity." *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 439–440 (Alaska 2004) (internal quotation marks and fn. refs. omitted). In holding that a college served as "an arm of the tribe and not as a mere business", the Court of Appeals for the Eighth Circuit in *Hagen* relied on the facts that the college was "chartered, funded, and controlled by the Tribe to provide education to tribal members on Indian land". *Hagen*, 205 F.3d at 1043. Similarly, in the few cases that have held a State-chartered corporation to be entitled to tribal sovereign immunity, factors important to that holding were: (1) the corporation's purpose of improving the general welfare of the tribe, and (2) the assurance that the corporation's governing body could be composed only of tribal representatives. *See J.L.*

---

[16] *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) ("[T]he College serves as an arm of the tribe and not as a mere business and is thus entitled to tribal sovereign immunity"); *Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d 581, 583 (8th Cir. 1998) (holding that a tribal housing authority established by tribal council pursuant to its powers of self-government was a tribal agency rather than "a separate corporate entity created by the tribe"); *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668, 670–671 (8th Cir. 1986) ("As an arm of tribal government, a tribal housing authority possesses attributes of tribal sovereignty * * * and suits against an agency like the Housing Authority normally are barred absent a waiver of sovereign immunity").

*Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd.*, 842 F. Supp. 2d 1163, 1176 (D.S.D. 2012); *Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.*, 658 N.E.2d 989, 993 (N.Y. 1995). Uniband's facts are otherwise.

First, although its brief asserts that "from the beginning [Uniband] was a means to promote economic development on TMBCI's disadvantaged reservation suffering from high and chronic unemployment", Uniband cites no record support for this proposition. In fact, Uniband's certificate of incorporation states that its purpose is simply to engage in "any lawful act or activity"—not just activities that "promote economic development".

Second, Uniband has nothing in its corporate charter or bylaws to ensure that Uniband's governing body is composed of TMBCI's tribal representatives. Rather, article IV, section 4.2 of Uniband's bylaws sets forth the qualifications for Uniband's directors and states simply: "Directors need not be residents of Delaware or shareholders of the corporation. They need have no other qualification." Thus, Uniband's governing body may be *but need not be* composed of TMBCI's tribal representatives. Uniband's directors may be under the de facto control of TMBCI by virtue of TMBCI's sole ownership of Uniband, but the same can be said for any wholly owned investment, whether or not it has any other claim to being an "arm" of its owner. Moreover, nothing prevents TMBCI from selling some or all of its shares and destroying that de facto control.

Since Uniband's purposes may or may not promote the general welfare of TMBCI's members, and since it may or may not be managed and controlled by TMBCI's tribal representatives, we conclude it fails to be an "arm" of TMBCI.

(b) *Tribal establishment*

Another factor that distinguishes an organization entitled to tribal sovereign immunity (as opposed to a mere business interest of a tribe) is that the tribal council establishes the organization pursuant to its powers of self-government. *See Dillon*, 144 F.3d at 583 (concluding that a housing authority "established by a tribal council pursuant to its powers of self-government" is a tribal agency entitled to tribal sovereign immunity). Uniband, however, chartered not by the tribe but

by the State of Delaware, is an entity that exists by virtue of the sovereign powers of Delaware, and Uniband's powers are defined and limited by Delaware law. In particular, Uniband, like every other corporation created under title 8 of the Delaware Code (including chapter 1 entitled "General Corporation Law", pursuant to which Uniband was established), "shall have power to: * * * [s]ue *and be sued* in all courts and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding, in its corporate name". Del. Code Ann. tit. 8, sec. 122 (2011) (emphasis added). Uniband does not explain what might trump this statutory provision.

Moreover, Uniband was established as a Delaware corporation in 1987 by TMBCI and a third party not affiliated with TMBCI, and for three years TMBCI held only 51% of Uniband. Thus, TMBCI did not establish Uniband by itself; at its inception Uniband was simply a business owned in part by TMBCI and was clearly "a separate corporate entity created [in part] by the tribe". *Dillon*, 144 F.3d at 583; *see also Myrick v. Devils Sioux Mfg. Corp.*, 718 F. Supp. 753, 755 (D.N.D. 1989) (holding that a State-chartered corporation partially owned by an Indian tribe was not a tribal agency). Uniband has not shown us how TMBCI's purchasing an additional 49% of Uniband transformed Uniband from a mere business holding into a tribal agency established by a tribal council pursuant to the tribe's powers of self-government. *See McNally CPA's & Consultants, S.C. v. DJ Hosts, Inc.*, 692 N.W.2d 247, 253 (Wis. Ct. App. 2004) (rejecting the argument that tribal immunity attaches to a corporation when a tribe acquires 100% ownership of the corporation).

(c) *Other criteria*

Other courts have used several additional factors to determine whether tribal sovereign immunity is possessed by a tribal business, which, if so, is sometimes referred to as a "subordinate economic entity",[17] and those factors do not

_____

[17] The subordinate economic entity doctrine was initially articulated by Arizona State courts, *see, e.g.*, *Dixon v. Picopa Constr. Co.*, 772 P.2d 1104, 1108 (Ariz. 1989); *White Mountain Apache Indian Tribe v. Shelley*, 480 P.2d 654, 657 (Ariz. 1971), and has been adopted by the Court of Appeals for the Tenth Circuit, *see, e.g.*, *Somerlott v. Cherokee Nation Distribs., Inc.*,

Continued

support Uniband's claim. Courts have considered some or all of the following factors:

> (1) the announced purpose for which the entity was formed; (2) whether the entity was formed to manage or exploit specific tribal resources; (3) whether federal policy designed to protect Indian assets and tribal cultural autonomy is furthered by the extension of sovereign immunity to the entity; (4) whether the entity is organized under the tribe's laws or constitution rather than federal law; (5) whether the entity's purposes are similar to or serve those of the tribal government; (6) whether the entity's governing body is comprised mainly of tribal officials; (7) whether the tribe has legal title or ownership of property used by the entity; (8) whether tribal officials exercise control over the administration or accounting activities of the organization; (9) whether the tribe's governing body has power to dismiss members of the organization's governing body, and (10) whether the entity generates its own revenue, whether a suit against the entity would impact the tribe's fiscal resources, and whether it may bind or obligate tribal funds. [*Johnson v. Harrah's Kan. Casino Corp.*, No. 5:04–CV–04142–JAR, 2006 WL 463138, at *4–*6 (D. Kan. Feb. 23, 2006); fn. ref. omitted.[18]]

While several of these factors overlap with the Court of Appeals for the Eighth Circuit's analysis and therefore are adequately addressed above, the remainder—in particular, the promotion of tribal autonomy, the financial relationship between the entity and the tribe, and whether the entity was created under State law—bear further analysis here.

*Promotion of tribal autonomy*. In *Allen v. Gold Country Casino*, 464 F.3d 1044 (9th Cir. 2006), the Court of Appeals for the Ninth Circuit held that a tribe's casino was "no ordinary business" and was entitled to tribal immunity because

---

686 F.3d at 1148–1150.

[18] In the following cases, courts have considered some or all of the factors listed in *Johnson v. Harrah's Kan. Casino Corp.*, No. 5:04–CV–04142–JAR, 2006 WL 463138, at *4–*6 (D. Kan. Feb. 23, 2006): *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d at 1148–1150; *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Econ. Dev. Auth.*, 629 F.3d 1173 (10th Cir. 2010); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046–1047 (9th Cir. 2006); *J.L. Ward Assocs.*, 842 F. Supp. 2d at 1176; *Bucher v. Dakota Fin. Corp. (In re Whitaker)*, 474 B.R. 687, 696–697 (B.A.P. 8th Cir. 2012); *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 440 (Alaska 2004); *Am. Prop. Mgmt. Corp. v. Superior Court*, 141 Cal. Rptr. 3d 802, 809 (Ct. App. 2012); *Cash Advance & Preferred Cash Loans v. Colo. ex rel. Suthers*, 242 P.3d 1099, 1109 (Colo. 2010); *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 294 (Minn. 1996); *Airvator, Inc. v. Turtle Mountain Mfg. Co.*, 329 N.W.2d 596, 604 (N.D. 1983); *Wright v. Prairie Chicken*, 579 N.W.2d 7, 10 (S.D. 1998).

the casino's "creation was dependent upon [tribal] govern-
ment approval at numerous levels", and the Federal statute
under which the casino was created intended that creation
and operation of Indian casinos promote "'tribal economic
development, self-sufficiency, and strong tribal govern-
ments'". *Id.* at 1046–1047 (quoting 25 U.S.C. sec. 2702(1)
(1994)); *see also J.L. Ward Assocs.*, 842 F. Supp. 2d at 1177;
*Cash Advance & Preferred Cash Loans v. Colo. ex rel.
Suthers*, 242 P.3d 1099, 1109 (Colo. 2010); *Gavle v. Little Six,
Inc.*, 555 N.W.2d 284, 294 (Minn. 1996). While Uniband
appears to have employed TMBCI members to perform its
data entry services, it has not shown the extent of its
employment of TMBCI members nor demonstrated that it
was established to promote TMBCI's economic development,
as opposed to simply generating revenue. Uniband has not
shown that its operation promotes tribal "self-sufficiency" or
"strong tribal government", nor that extending tribal immu-
nity to such an operation would "protect Indian assets and
tribal cultural autonomy". Moreover, as we have already dis-
cussed above, Uniband's creation did not depend only on
TMBCI's approval.

*Financial relationship*. A related and critical factor for
some courts in extending tribal sovereign immunity to tribal
businesses is the business entity's financial relationship with
the tribe. *See Ransom v. St. Regis Mohawk Educ. & Cmty.
Fund, Inc.*, 658 N.E.2d at 992–993. "[I]f a judgment against
* * * [an entity] will not reach the tribe's assets or if it lacks
the 'power to bind or obligate the funds of the [tribe],' it is
unlikely that the tribe is the real party in interest. If, on the
other hand, the tribe would be legally responsible for the
entity's obligations, it may be an arm of the tribe." *Runyon
ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d at
440–441 (quoting *Ransom*, 658 N.E.2d at 992). Uniband has
not shown that it is funded by TMBCI or that its actions
would "expos[e] the tribal treasury", *id.*, and the record
shows otherwise.

*Creation under State law*. Another crucial factor for many
courts that has weighed against the extension of sovereign
immunity has been the tribe's creating an entity under State
law. *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d at
1148–1150 (10th Cir. 2012) ("the subordinate economic entity
test is inapplicable to entities which are legally distinct from

their members and which voluntarily subject themselves to the authority of another sovereign"); *see also Am. Prop. Mgmt. Corp. v. Superior Court*, 141 Cal. Rptr. 3d 802, 810 (Ct. App. 2012); *Airvator, Inc. v. Turtle Mountain Mfg. Co.*, 329 N.W.2d 596, 602–604 (N.D. 1983); *Wright v. Prairie Chicken*, 579 N.W.2d 7, 10 (S.D. 1998). Thus, Uniband's incorporation under Delaware law weighs heavily against tribal sovereign immunity.

Even under more expansive standards, Uniband has failed to establish that it would be entitled to sovereign immunity.

(2) *Sovereign immunity does not necessarily confer "integral part" status.*

Uniband's sovereign immunity argument assumes that if an organization is entitled to tribal sovereign immunity, then the organization is therefore an integral part of the tribe. While the two concepts are not unrelated, the question whether the sovereign immunity of a tribe extends to an organization is distinct from the question whether an organization is an integral part of a sovereign entity for tax purposes. The entity classification regulation that Uniband relies on here is not the only instance in which "integral part" status arises in tax law, but we find no analogous provision in which sovereign immunity assures that status.

Under section 501(c)(3), governance is not a tax-exempt purpose, so that while a mere "instrumentality" of a State may be exempt from tax under that provision, an "integral part" is not. *See* Rev. Rul. 60–384, 1960–2 C.B. 172. Under this analysis, an "integral part" of a State government is an "integral governmental instrumentalit[y] exercising 'sovereign' powers". *Old Colony Trust Co. v. United States*, 438 F.2d 684, 687 (1st Cir. 1971); *see also Tex. Learning Tech. Grp. v. Commissioner*, 958 F.2d 122, 126–127 (5th Cir. 1992), *aff'g* 96 T.C. 686 (1991). Such "sovereign powers" might include sovereign immunity, *see Breakthrough Mgmt. Grp., Inc. v. Chukchansi Econ. Dev. Auth.*, 629 F.3d 1173, 1182–1183 (10th Cir. 2010); but in fact the three powers usually examined in this context are "[t]he power to tax, the power of eminent domain, and the police power", *Tex. Learning Tech. Grp. v. Commissioner*, 958 F.2d at 124—none of which Uniband claims to possess.

Similarly, section 892 exempts from tax U.S.-source income earned by "foreign governments", and the temporary regulations define "foreign government" to mean "only the integral parts * * * of a foreign sovereign." 26 C.F.R. sec. 1.892–2T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 24061 (June 27, 1988). However, the definition of "integral part" in the temporary regulations makes no mention of sovereign immunity. *Id.* sec. 1.892–2T(a)(2) ("An 'integral part' of a foreign sovereign is any person, body of persons, organization, agency, bureau, fund, instrumentality, or other body, however designated, that constitutes a governing authority of a foreign country. The net earnings of the governing authority must be credited to its own account or to other accounts of the foreign sovereign, with no portion inuring to the benefit of any private person"). Under that definition, though it is not controlling in this case, even if Uniband had sovereign immunity, it could not be an "integral part" of TMBCI, because it is not "a governing authority".

Uniband relies on G.C.M. 38,853 (May 17, 1982) as the foundation for its sovereign immunity argument, since that memorandum does relate sovereign immunity to tax exemption. However, a general counsel memorandum is merely a legal opinion from one division of the Commissioner's Office of Chief Counsel to another, and is not precedential. *Old Harbor Native Corp. v. Commissioner*, 104 T.C. 191, 206–207 (1995). But even if G.C.M. 38,853 were binding authority, it does not support Uniband's conclusion. G.C.M. 38,853 lists sovereign immunity as one of *several* factors [19] to support the IRS's conclusion that *a section 17 corporation* is not subject to the corporate income tax. It does not state whether a section 17 corporation is an integral part of a tribe, or discuss what factors to consider to determine if an entity is an integral part of a tribe. Therefore, even if Uniband had established that it possesses sovereign immunity, it would

---

[19] In addition, G.C.M. 38,853 (May 17, 1982) relied on "the traditional federal income tax immunity of Indian tribes, the Congressional purpose in enacting section 17 of the [Indian Reorganization] Act, the lack of any indication that such immunity would be waived by incorporation, [and] the implication in the legislation that the tribe and the corporation are one". Uniband argues that it achieves the same purposes that Congress had for section 17 corporations, but as we discuss below in part I.B.3.d., Uniband is clearly not a section 17 corporation.

not necessarily have thereby established that it is an "integral part" of TMBCI for purposes of entity classification in 26 C.F.R. section 301.7701–1(a)(2), Proced. & Admin. Regs.

c. *"Indian tribal organization"*

Uniband lays great stress on the fact that it is an "Indian tribal organization" ("ITO") for purposes of 18 U.S.C. section 1163 (1994) and argues that it is therefore an integral part of TMBCI. It appears that a State-chartered corporation can be an ITO,[20] and we assume that Uniband is an ITO;[21] but it does not follow that Uniband is therefore an integral part of TMBCI for Federal tax purposes.

Section 1163 of title 18 makes it a Federal crime to embezzle money or other property "belonging to any Indian tribal organization". Section 1163 provides that "the term 'Indian tribal organization' means any tribe, band, or community of Indians which is subject to the laws of the United States relating to Indian affairs or any corporation, association, or group which is organized under any of such laws"— and it states that the term is so defined "[a]s used in this section". The statute thus includes nothing to support the suggestion that ITO status has legal implications outside of the crime defined in section 1163. Uniband has not cited and we have not found any authority to support its contention that if an organization is an ITO for purposes of 18 U.S.C. section 1163, it should, therefore, be treated as an integral part of the tribe for purposes of the Internal Revenue Code.

This lack of authority is not surprising, since the criminal-law purposes of 18 U.S.C. section 1163 have no resonance with the taxation-law principles at issue here. There is no

---

[20] *See United States v. Logan*, 641 F.2d 860, 862 (10th Cir. 1981) (a State-chartered corporation established under the guidelines of the Indian Financing Act of 1974 is a "corporation organized under the laws of the United States relating to Indian affairs within the meaning of [18 U.S.C.] section 1163").

[21] The Commissioner disputes Uniband's ITO status, but Uniband points to an instance in which the United States prosecuted (and entered into a plea agreement with) an individual who had embezzled funds from Uniband; and in that instance the individual was charged with violating 18 U.S.C. section 1163 (among other provisions), and the plea agreement included the assertion that Uniband is an ITO.

apparent reason the criminal statute should reach only entities that share the tax attributes of a tribe. Moreover, if every ITO were by definition an "integral part" of an Indian tribe, then every "corporation, association, or group which is organized" under "the laws of the United States relating to Indian affairs" would be exempt from income tax—a broad proposition that cannot be justified. The Commissioner aptly states that Uniband's ITO status "is at best peripheral to the issue of whether the Petitioner is subject to the corporate income tax".

d. *Similarity to section 17 corporations*

The fourth strain of Uniband's argument that it is an integral part of TMBCI and therefore shares its exemption starts with the proposition that corporations established pursuant to section 17 of the IRA, codified at 25 U.S.C. section 477—referred to as "section 17 corporations"—are not subject to the corporate income tax, as is stated in 26 C.F.R. section 301.7701–1(a)(3) (effective January 1, 1997), and as the IRS previously held in Revenue Ruling 94–16, 1994–1 C.B. 19.[22] Uniband asserts that "the logic behind Rev. Rul.

[22] Uniband's argument for its pre-1997 status (before the regulation became effective) appears to be based solely on "the logic behind Rev. Rul. 94–16". A revenue ruling is not a regulation issued after notice and comment, *PBS Holdings, Inc. v. Commissioner*, 129 T.C. 131, 144–145 (2007); and this Court has held that such a ruling can be invoked by a taxpayer and will be enforced only as a concession by the Commissioner, *Rauenhorst v. Commissioner*, 119 T.C. 157, 171 (2002), and that such a concession will be limited to its specific facts and holding. That is, a taxpayer can rely on a revenue ruling only to the extent that the taxpayer's facts are "substantially the same as" those in the ruling and only as to the issue addressed in the ruling. *See* 26 C.F.R. sec. 601.601(d)(2)(v)(e), Statement of Procedural Rules. In this instance, Uniband's facts are *not* substantially the same as those in Rev. Rul. 94–16 (rather, Uniband is *not* a section 17 corporation), and one of the holdings in the ruling (i.e., that a State-chartered corporation does not share a tribe's exemption) flatly contradicts the position that Uniband advances. Accordingly, the ruling clearly cannot be construed as a concession by the Commissioner that Uniband should be exempt from tax. However, Uniband nonetheless takes the (somewhat awkward) position that the holding of Rev. Rul. 94–16 regarding section 17 corporations should be regarded as persuasive and should be extended to this case, *see United States v. Mead Corp.*, 533 U.S. 218, 234–235 (2001) (an agency's interpretation may merit deference under *Skidmore v. Swift*
Continued

94–16" that exempts section 17 corporations from Federal income tax applies equally to tribal corporations chartered under State law. Uniband thus argues that a State-chartered corporation wholly owned by an Indian tribe and a section 17 corporation are essentially the same, and that they should therefore obtain the same tax treatment. [23]

To apply the "logic of Rev. Rul. 94–16" and the regulation to Uniband's facts, we must ask: Why are section 17 corporations not subject to the corporate income tax? The parties articulate that logic differently: Uniband states that "tax-exempt status is appropriate for a section 17 corporation because the tribe and its corporation are the same governmental entity, even though the sole purpose of the section 17 corporation may be primarily commercial * * * [and] federal cases involving tribal sovereign immunity justify a parallel treatment for federal income tax purposes", while the Commissioner states that "a section 17 corporation * * * is a form of the tribe. It is part of the organizational structure of the tribe just as much as is a tribal government formed under section 16".

Uniband's rationale actually works against it, since, as we held above, Uniband has failed to show that it possesses TMBCI's sovereign immunity. Moreover, Uniband's rationale is faulty because it mistakes the effect (sharing TMBCI's sovereign immunity) for the cause (being a manifestation or, in the Commissioner's word, a "form") of TMBCI. *See Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 921 (6th Cir. 2009) ("the language of Section 17 itself— by calling the entity an 'incorporated tribe'—suggests that the entity is an arm of the tribe * * * that do[es] not auto-

---

& *Co*., 323 U.S. 134 (1944)), but that second holding of Rev. Rul. 94–16 regarding State-chartered corporations was incorrect. Even so, since the regulation effectively established the position in the ruling, and since we hold that Uniband is materially distinguishable from a section 17 corporation, the same analysis suffices for both its pre- and post-regulation years.

[23] Uniband argues that giving it tax treatment different from that of a section 17 corporation would yield "inequitable results", citing the uniformity clause of the United States Constitution. *See* U.S. Const. art. I, sec. 8, cl. 1. This constitutional argument fails because the "constitutional requirement of uniformity is not intrinsic, but geographic". *Poe v. Seaborn*, 282 U.S. 101, 117 (1930). Because Uniband is materially different from section 17 corporations, for the reasons we explain below, it is not entitled to the same treatment they receive.

matically forfeit tribal-sovereign immunity"). If we simply examine the nature of a section 17 corporation, we see that Uniband differs radically from a section 17 corporation in ways that mark it as distinct from TMBCI.

(1) *The origin of section 17 corporations*

Before the enactment of the IRA, both the governmental and business functions of a tribe were conducted in the same unincorporated entity. In 1934 Congress enacted the IRA, which allows a tribe to operate its governmental affairs and commercial matters through separate mechanisms. Section 16 of the IRA (codified at 25 U.S.C. sec. 476) permits a tribe to adopt a constitution and bylaws under which it conducts its governmental affairs; and section 17 of the IRA allows a tribe to operate its commercial enterprises through a federally chartered corporation.

According to its legislative history, the purpose of section 17 was to "permit Indian tribes to equip themselves with the devices of modern business organization, through forming themselves into business corporations." S. Rept. No. 1080, 73d Cong., 2d Sess. 1 (1934). One feature of a section 17 corporation is that it gives a tribe the ability to waive tribal sovereign immunity for a business operated by a section 17 corporation without having to waive the tribe's immunity for nonbusiness liability. This waiver removes a major market hurdle for a tribal business (because third parties generally do not want to enter into contracts with parties they cannot sue to enforce agreements or to seek tort damages) and puts a tribal business on equal footing with nontribal businesses.

(2) *Characteristics of section 17 corporations*

Section 17 corporations have several distinguishing characteristics, all of which are reflected in the organizing documents of TMBCI's section 17 corporation, as quoted above pages 237–238. The first is that the establishment of a section 17 corporation is within the discretion of the Secretary of the Interior. A petitioning tribe has the power only to adopt or to veto the corporate charter issued by the Secretary of the Interior. *See* 25 U.S.C. sec. 477 ("The Secretary of the Interior may, upon petition by any tribe, issue a charter of incorporation to such tribe"). Consequently, a sec-

tion 17 charter will confer only powers that the Secretary of the Interior is willing for the corporation to possess. *See Md. Cas. Co. v. Citizen Nat'l Bank of W. Hollywood*, 361 F.2d 517, 520 (5th Cir. 1966) ("the powers granted to the corporation were only those which the Secretary of the Interior, by the terms of the charter, conveyed to them").

Second, "Any charter so issued shall not be revoked or surrendered except by Act of Congress." 25 U.S.C. sec. 477.

Third, 25 U.S.C. section 477 gives a section 17 corporation "the power to purchase restricted Indian lands", a right that is otherwise exclusively held by tribes. *See id.* sec. 464.

Fourth, the IRA places restrictions on the alienation of corporate stock and of certain corporate-owned land. *See id.* ("no sale, devise, gift, exchange, or other transfer of restricted Indian lands or of shares in the assets of any Indian tribe or corporation organized under this Act shall be made or approved", subject to provisos); *id.* sec. 477 ("no authority shall be granted to sell, mortgage, or lease for a period exceeding twenty-five years any trust or restricted lands included in the limits of the reservation").

These limitations are obviously aimed at preserving the tribe's assets and existence—suggesting that the tribe exists, at least in part, through its section 17 corporation, notwithstanding the fact that the corporation is a distinct legal entity.

### (3) *Taxation of section 17 corporations*

The IRA makes no provision as to tax liability of section 17 corporations, but in 1973 the Supreme Court, in *Mescalero Apache Tribe*, 411 U.S. at 157–158, shed some light on the issue. In *Mescalero Apache Tribe* the Supreme Court faced the question whether a tribally owned ski resort was exempt from State tax[24] when it was unclear whether the resort was an unincorporated entity operating under section 16 (i.e., as a governmental organization) or was a section 17 corporation. *Id.* at 157 n.13. The Court concluded that under either form the ski resort would be subject to State tax, since the activity

---

[24] The exemption at issue in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973), arose under the provision that "any lands or rights acquired" pursuant to any provision of the IRA "shall be exempt from State and local taxation." 25 U.S.C. sec. 465 (1968).

was conducted outside of the borders of the Indian reservation. *Id.* at 157–158. In so concluding, the Supreme Court stated that "the question of tax immunity cannot be made to turn on the particular form in which the Tribe chooses to conduct its business." *Id.* at 157 n.13.

In 1981 the Commissioner, relying on this statement in *Mescalero Apache Tribe*, concluded that a "federally chartered Indian tribal corporation shares the same tax status as the Indian tribe and is not taxable on income from activities carried on within the boundaries of the reservation." Rev. Rul. 81–295, 1981–2 C.B. 15. Revenue Ruling 81–295 did not address State-chartered corporations owned by Indian tribes.

In 1994 the Commissioner clarified Revenue Ruling 81–295 in Revenue Ruling 94–16, 1994–1 C.B. at 20, in which he stated:

> An Indian tribal corporation organized under section 17 of the IRA shares the same tax status as the tribe. Therefore, any income earned by such a corporation, regardless of the location of the business activities that produced the income, is not subject to federal income tax. * * * [A] corporation organized by an Indian tribe under state law does not share the same tax status as the tribe for federal income tax purposes and is subject to federal income tax on any income earned, regardless of the location of the business activities that produced the income.

The "check-the-box" regulations, effective January 1, 1997, followed the approach of Revenue Ruling 94–16. The regulation addressed the classification of section 17 corporations for tax purposes by providing that "tribes incorporated under section 17 of the Indian Reorganization Act of 1934 * * * are not recognized as separate entities for federal tax purposes." 26 C.F.R. sec. 301.7701–1(a)(3). Under this regulation, a section 17 corporation is not regarded as separate from the tribe for tax purposes and, as a result, is not subject to Federal income tax.

(4) *Uniband's differences from a section 17 corporation*

Uniband does not have the distinctive characteristics of a section 17 corporation, as outlined above. First, unlike a section 17 corporation that is established at the discretion of the Secretary of the Interior and that is given only the powers that the Secretary of the Interior approves, Uniband was established by the decision of TMBCI and its co-shareholder

and was given by them all the lawful powers that a Delaware corporation may possess.

Second, unlike a section 17 charter, which "shall not be revoked or surrendered except by Act of Congress", Uniband exists at the pleasure of its owner, TMBCI, and its charter can be revoked by the State of Delaware. *See* Del. Code Ann. tit. 8, sec. 284(a) (2011) ("The Court of Chancery shall have jurisdiction to revoke or forfeit the charter of any corporation for abuse, misuse or nonuse of its corporate powers, privileges or franchises").

Third, Uniband does not possess the special power to purchase restricted Indian lands, a power that a section 17 corporation is given by statute.

Fourth, Uniband is not bound by the restrictions the IRA places on the alienation of section 17 corporate stock and of certain corporate-owned land. TMBCI is free to sell all or part of its Uniband stock, as it could any investment.

In sum, Uniband lacks the special character of a section 17 corporation and its special relationship to an Indian tribe. As a State-chartered corporation, it is an investment of TMBCI; its stock is property owned by TMBCI. It is not an integral part of TMBCI but is a distinct corporate entity with its own tax character. Accordingly, unlike TMBCI, Uniband is subject to Federal income tax.

## II. *Consolidated return issue*

We now turn to Uniband's alternative claim that for tax years 1996, 1997, and 1998 it was entitled to and did properly file consolidated returns with its sister corporation TMMC. The filing of a consolidated return is a "privilege", sec. 1501, as to which the Secretary is explicitly authorized to promulgate regulations,[25] sec. 1502. To prevail with this claim, Uniband must show that Uniband and TMMC were part of an affiliated group of corporations and that the group filed valid consolidated returns for the years in issue.[26] Uniband's claim fails for multiple reasons.

---

[25] The consolidated return regulations are legislative in character and have the force and effect of law. *Salem Packing Co. v. Commissioner*, 56 T.C. 131, 141 (1971).

[26] Because we hold against Uniband on both these grounds, we need not address the Commissioner's further contention that the 1996 consolidated return, even if otherwise valid, was untimely.

A. *Uniband was not part of an affiliated group*.

Section 1501 provides that "[a]n affiliated group of corporations shall * * * have the privilege of making a consolidated return". An affiliated group is one or more chains of "includible corporations" connected through the requisite stock ownership by a common parent corporation which is also an "includible corporation". Sec. 1504(a). An "includible corporation" is any corporation, except those specifically excluded in section 1504(b). *See* sec. 1504(b)(1)–(8).

Uniband contends that itself, TMMC, and TMBCI are all corporations within the meaning of section 7701(a) and 26 C.F.R. section 301.7701–2(b), Proced. & Admin. Regs., and therefore are "includible corporations" in an "affiliated group", eligible to make a consolidated return. With regard to TMBCI, Uniband argues that it is a corporation, first, because it is a "body politic" described in 26 C.F.R. section 301.7701–2(b)(1), and, second, because it is treated as a corporation for purposes of the wagering tax imposed by section 4401.[27] We disagree with both of Uniband's arguments.[28]

---

[27] Uniband in its briefing appears to ask us to reconsider our order striking Uniband's third contention that TMBCI is a corporation because it is an "association" for tax purposes. We will not do so, since in response to a request for admissions, Uniband explicitly admitted that during the periods at issue it was not "an entity of the type described in Treas. Reg. § 301.7701–2(b)(2)" (i.e., an "association") and then agreed to the same assertion in the parties' joint stipulation. *See* order of Dec. 10, 2010; *see also United States v. Mazurie*, 419 U.S. 544, 557 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory"; and "Indian tribes within 'Indian country' are a good deal more than 'private, voluntary organizations'"), discussed above in part I.A.3. Uniband's "association" argument addresses whether Uniband and TMMC were in an affiliated group (discussed in this part II.A.), and if this argument prevailed, it would, by itself, still be unavailing given our conclusion, *see* part II.B., that even if Uniband and TMMC were in an affiliated group, the consolidated returns that were filed are still invalid.

[28] The Commissioner argues in the alternative that since TMBCI is an Indian tribe and the Code "provides for special treatment of that organization", 26 C.F.R. sec. 301.7701–1(b), the entity classification regulations do not apply to TMBCI. Given our conclusion that TMBCI is not described within the definition of a "corporation" as provided in 26 C.F.R. sec. 301.7701–2(b), Proced. & Admin. Regs., we do not need to address whether the Code "provides for special treatment" of TMBCI for purposes of 26

Continued

1. *Body politic*

For tax purposes, the term "corporation" includes "[a] business entity organized under a Federal or State statute, or under a statute of a federally recognized Indian tribe, if the statute describes or refers to the entity as incorporated or as a corporation, body corporate, or body politic". 26 C.F.R. sec. 301.7701–2(b)(1). TMBCI is an unincorporated band of Indians organized under a revised constitution and by-laws approved by the Secretary of the Interior pursuant to 25 U.S.C. section 476. Nothing in TMBCI's organizing statute, 25 U.S.C. section 476, or even TMBCI's constitution "refers to [TMBCI] * * * as * * * [a] body politic". Accordingly, TMBCI can not be considered a corporation under the definition provided in 26 C.F.R. section 301.7701–2(b)(1).

2. *An entity taxed as a corporation*

The term "corporation" also includes "[a] business entity that is taxable as a corporation under a provision of the Internal Revenue Code other than section 7701(a)(3)". 26 C.F.R. sec. 301.7701–2(b)(7). Uniband argues that TMBCI is taxed as a corporation for purposes of the wagering tax imposed by section 4401 and that it is therefore a corporation under 26 C.F.R. section 301.7701–2(b)(7). It is true that Indian tribes, including TMBCI, are subject to tax under section 4401, *see Chickasaw Nation*, 534 U.S. at 95, but not because tribes are corporations. Rather, section 4401 imposes an excise tax on certain wagers and provides that "[e]*ach person* who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him." Sec. 4401(c) (emphasis added). An Indian tribe is considered a "person" for purposes of section 4401(c), *see Chickasaw Nation*, 208 F.3d at 878–879, and it is this classification (i.e., as a person, not as a corporation) that makes TMBCI taxable under section 4401. Therefore, section 4401 does not cause TMBCI to be a corporation under the terms of 26 C.F.R. section 301.7701–2(b)(7).

---

C.F.R. sec. 301.7701–1(b). *Cf.* part I.A.3. above.

B. *The consolidated returns were not valid*.

Even if we assume, contrary to our holding in part II.A. above, that Uniband was part of an affiliated group entitled to file a consolidated return, the purported consolidated returns that Uniband filed were invalid because TMBCI did not make the returns, did not consent to them, and did not report its items on them.

1. *TMBCI did not make the consolidated returns*.

26 C.F.R. section 1.1502–75(h)(1), Income Tax Regs., states: "The consolidated return shall be made on Form 1120 for the group by the common parent corporation." Assuming (as Uniband contends) that TMBCI were properly treated as a corporation, then it would be TMBCI that would be "the common parent corporation" and that would have to make the consolidated return in order for it to be a valid consolidated return. However, Uniband has stipulated that TMBCI has not filed any tax returns for the years at issue. Instead, it is Uniband and not TMBCI that appears as the taxpayer on each of the Forms 1120 filed for the years at issue. Accordingly, all of the consolidated returns that Uniband filed with TMMC for 1996, 1997, and 1998 (including the amended 1998 consolidated return) are invalid because Uniband, not TMBCI, filed the returns. This major irregularity produced a related but distinct fatal flaw:

2. *TMBCI did not consent to the consolidated returns*.

Section 1501 provides in part:

> The making of a consolidated return shall be upon the condition that *all corporations* which at any time during the taxable year have been members of the affiliated group *consent* to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. *The making of a consolidated return shall be considered as such consent*. * * * [Emphasis added.]

Corresponding regulations provide:

> The consent of a corporation * * * [to all of the consolidated return regulations] shall be made by such corporation joining in the making of the consolidated return for such year. A corporation shall be deemed to have joined in the making of such return for such year if it files a Form 1122 in the manner specified in paragraph (h)(2) of this section. [26 C.F.R. sec. 1.1502–75(b)(1).]

The directions in 26 C.F.R. section 1.1502–75(h)(2) for filing Form 1122, "Authorization and Consent of Subsidiary Corporation To Be Included in a Consolidated Income Tax Return", require that each subsidiary execute a Form 1122 and that the forms be attached to the consolidated return.

Thus, the parent "mak[es]" the return, 26 C.F.R. sec. 1.1502–75(h)(1), and thereby "consent[s]" to it, sec. 1501; and the subsidiary "consent[s]" to the return by "joining in making" it, 26 C.F.R. sec. 1.1502–75(b)(1). Paragraph (h)(2) gives directions for the subsidiary to file the "Authorization and Consent", and not for the common parent to do so, because the preceding paragraph (h)(1) provides: "The consolidated return *shall be made* on Form 1120 for the group *by the common parent* corporation." 26 C.F.R. sec. 1.1502–75(h)(1) (emphasis added). [29]

Accordingly, a common parent does not consent by "join[ing]" a return; instead, as section 1501 itself provides: "The making of * * * [the return] shall be considered as such [i.e., common parent's] consent". But TMBCI neither "made" the returns at issue here nor "joined" them, and it therefore never consented to them. [30]

---

[29] The consolidated return must be executed by the common parent's "president, vice president, treasurer, assistant treasurer, chief accounting officer or any other officer duly authorized so to act." Sec. 6062 (cited in 26 C.F.R. sec. 1.1502–75(h)(3), Income Tax Regs.).

[30] 26 C.F.R. section 1.1502–75(e) suggests that failing to include an affiliated corporation on a consolidated return may not be fatal to the return:

> If a consolidated return is required for the taxable year under the provisions of paragraph (a)(2) of this section [requiring continued filing of consolidated returns, if they were filed for the preceding year], the tax liability of all members of the group for such year shall be computed on a consolidated basis even though * * * [t]here has been a failure to include in the consolidated return the income of any member of the group.

However, in order to invoke this provision, the provisions of 26 C.F.R. section 1.1502–75(a)(2) must first apply, which requires at least one correct and valid consolidated return to have been filed for the prior year. None of the returns in this case satisfies this condition because none of the returns was filed by TMBCI, the common parent, as required by 26 C.F.R. section 1.1502–75(h)(1).

   3. *TMBCI did not report its items on the consolidated
      returns for 1996 or 1997.*

   Although the consolidated return regulations require that
"[a] consolidated return must include the common parent's
items of income, gain, deduction, loss, and credit for the
entire consolidated return year," 26 C.F.R. sec. 1.1502–
76(b)(1)(i), Income Tax Regs., no such items for TMBCI
appear on Uniband's consolidated returns for 1996 or 1997.
Subsidiaries are not entitled to file a consolidated return that
does not include a common parent's tax items. *Charles
Schneider & Co. v. Commissioner*, T.C. Memo. 1973–130,
*aff'd*, 500 F.2d 148 (8th Cir. 1974).
   Uniband acknowledged as much when it filed the amended
1998 consolidated return including information for TMBCI,
albeit in the form of zeros for each item.[31] However,
Uniband did not make similar corrections for the 1996
amended return or the 1997 return, which do not contain any
of TMBCI's tax items. Accordingly, the 1996 and 1997 puta-
tive consolidated returns were invalid for that additional rea-
son.
   For each year at issue, Uniband's consolidated returns
have multiple irregularities that render them invalid.
Uniband's tax liability will therefore be calculated without
including TMMC's tax items.

---

[31] Because the 1998 consolidated return was invalid for other reasons,
we need not consider whether in fact the zero entries render invalid the
purported consolidated return. It seems certain that Uniband reported
zeros not because those zero amounts corresponded to anything on
TMBCI's books but because Uniband takes the position that, because
TMBCI is exempt, its items to be reported are all zero. If so, then the re-
turns do not actually "consolidate" TMBCI's real items with Uniband's and
TMMC's but ignore them and use TMBCI as a figurehead. This dem-
onstrates the anomaly of attempting a consolidated return where the par-
ent is not subject to tax but the subsidiaries are. *See* sec. 1504(b)(1) (ex-
cluding from the definition of "includable corporation" eligible to join a con-
solidated return corporations exempt from tax under sec. 501); *cf.* 26
C.F.R. sec. 1.1502–100, Income Tax Regs. (allowing a tax-exempt corpora-
tion in special circumstances to file consolidated returns with other exempt
corporations, but changing the items that the corporations are required to
report).

III. *Wage deduction reduction issue*

For the years at issue Uniband deducted the entirety of its wage and employee expenses as business expenses under section 162. The Commissioner maintains that a portion of those expenses—i.e., an amount equal to the "Indian employment credit" determined under section 45A—is not deductible pursuant to section 280C. In Uniband's case, the amount of the credit as determined under section 45A is limited by section 38(c)(1), so that the Commissioner reduced Uniband's wage deduction by amounts of credit that were not actually allowed. Uniband responds with two arguments. First, it argues that the credit under section 45A is not mandatory, so that if a taxpayer chooses not to claim the allowed credit determined under section 45A (as was the case on Uniband's returns), then the wage deduction should not be reduced. Second, Uniband argues that section 280C should be interpreted as limiting the deductibility of wage and salary expenses only to the extent of the credit actually allowed after applying the limits imposed by section 38(c)(1), which significantly limited the allowance of credits in Uniband's case. [32] Neither of Uniband's arguments prevails.

The statutory framework is as follows. Section 280C(a) disallows a deduction for "wages or salaries paid or incurred for the taxable year which is equal to the sum of the credits determined for the taxable year under section[] 45A(a)". Section 45A(a) determines the amount of the Indian employment credit and provides in part:

> SEC. 45A(a). Amount of Credit.—For purposes of section 38, the amount of the Indian employment credit determined under this section with respect to any employer for any taxable year is an amount equal to 20 percent of the excess (if any) of—
>     (1) the sum of—

---

[32] As applied in this case, section 38(c)(1) limits the amount of Uniband's general business credit to the excess of Uniband's net income tax (calculated without credits allowed under subparts A and B) over Uniband's tentative minimum tax for the taxable year. For the years at issue, Uniband's tentative minimum tax was relatively high, causing a smaller excess between the net income tax and tentative minimum tax, which in turn caused a significantly smaller allowable credit for Uniband than was otherwise determined under section 45A. Any of Uniband's unused Indian employment credits, however, can be carried forward for 20 years. Sec. 39.

(A) the qualified wages paid or incurred during such taxable year, plus

(B) qualified employee health insurance costs paid or incurred during such taxable year, over

(2) the sum of the qualified wages and qualified employee health insurance costs (determined as if this section were in effect) which were paid or incurred by the employer (or any predecessor) during calendar year 1993.

The Indian employment credit is one of several credits that are included in calculation of the general business credit allowed under section 38. Hence, section 45A itself does not actually "allow" a credit; rather, it provides an "amount * * * *determined*" (emphasis added) that becomes a component of what is "*allowed* as a credit" by section 38(a) (emphasis added). This distinction is important to the deduction limitation in section 280C, because the limitation is calculated not by credits currently "allowed" but by "credits *determined* for the taxable year *under section*[ ] *45A(a)*". Sec. 280C (emphasis added). Unlike some other components of the general business credit, there is nothing in section 45A which makes the determination of the amount of the credit permissive.[33] Thus, contrary to Uniband's assertions, the determination of the credit amount under section 45A—and consequently, the deduction limitation under section 280C—occurs independently of whether the general business credit is currently fully allowed under section 38(a) or instead is limited by section 38(c)(1).

Uniband asks us to depart from the plain language of section 280C and interpret it as if it limited the deductibility of wage and salary expenses only to the extent credits are cur-

---

[33] *Cf.* sec. 51(j)(1) ("A taxpayer may elect to have this section [work opportunity credit] not apply for any taxable year"); sec. 40(f)(1) ("A taxpayer may elect to have this section [alcohol fuel credit] not apply for any taxable year"); sec. 43(e)(1) ("A taxpayer may elect to have this section [enhanced oil recovery credit] not apply for any taxable year"), sec. 45B(d)(1) ("This section [credit for portion of employer Social Security taxes paid with respect to employee cash tips] shall not apply to a taxpayer for any taxable year if such taxpayer elects to have this section not apply for such taxable year"), sec. 45E(e)(3) ("This section [small employer pension plan startup cost credit] shall not apply to a taxpayer for any taxable year if such taxpayer elects to have this section not apply for such taxable year"), sec. 45H(g) ("No credit [for production of low sulfur diesel fuel] shall be determined under subsection (a) for the taxable year if the taxpayer elects not to have subsection (a) apply to such taxable year").

rently allowed after applying the limits imposed by section 38(c)(1). Uniband argues we should adopt this interpretation because the purpose of section 45A was to increase employment on the reservations of economically disadvantaged Indian tribes, but the Commissioner's interpretation of section 280C frustrates this purpose. Uniband has a point. On its facts, and given the way the statutes are worded, Uniband would apparently have been better off *not* to hire as many Indians as it did—a circumstance that Congress did not likely intend.

However, "If the plain language of the statute is unambiguous, that language is conclusive absent clear legislative intent to the contrary. * * *  Therefore, if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir. 1997). The plain language of the statutes (sections 38, 45A, and 280C) reflect a legislative intent to create a tax advantage to spur economic development for Indian communities—but a tempered advantage that has built-in checks (e.g., section 38(c)(1)) to prevent potential abuse.

Moreover, Congress has shown that it is aware of the conundrum of the sort that faces Uniband and that it knows how to fix it when it wants to—i.e., by allowing a credit determination to be optional in certain cases. *See* note 33 above. For example, the legislative history to the research credit provision in section 51(g), H.R. Rept. No. 100–795, at 453 (1988), states: "The election [in section 51(g)] is intended to address the situation in which a taxpayer cannot claim the full amount of the research credit that is otherwise allowable because of the limitation imposed by the alternative minimum tax; in that situation, the taxpayer could avoid reduction of the deduction by electing not to claim the credit." Congress made no such provision as to the Indian employment credit. Accordingly, we adhere to the plain language of the statutes and sustain the Commissioner's disallowance of the business expenses, notwithstanding some arguable anomaly in the result.

IV. *Conclusion*

For the foregoing reasons we conclude that Uniband is not exempt from tax, that the consolidated returns that Uniband filed with TMMC were invalid, and that Uniband's wage and employee expense deductions for the years at issues should have been reduced by the amount of the Indian employment credit determined under section 45A, whether or not limited by section 38(c)(1).

To effect the foregoing,

*Decision will be entered pursuant to Rule 155.*